# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 22, 2017         Decided June 30, 2017

No. 15-1450

SEMINOLE ELECTRIC COOPERATIVE, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

FLORIDA POWER & LIGHT COMPANY,
INTERVENOR

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Jeffrey K. Janicke* argued the cause for petitioner. With him on the briefs were *William T. Miller* and *Kimberly B. Frank*. *John M. Adragna* entered an appearance.

*Ross R. Fulton*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Robert H. Solomon*, Solicitor, and *Lisa B. Luftig*, Attorney.

*John Lee Shepherd, Jr.* argued the cause for intervenor. With him on the brief were *James P. Danly* and *Thomas Orvald*.

Before: GARLAND, *Chief Judge*, and GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The Federal Energy Regulatory Commission determined that Florida Power & Light Company overcharged Seminole Electric Cooperative, Inc. for electricity and ordered a refund. Seminole claims that it was entitled to a larger refund and petitions for review. We deny the petition.

I

Seminole transmits electricity to its electrical-cooperative customers by purchasing transmission services from Florida Power. For every hour of the day, Seminole tells Florida Power the amount of electricity it expects its customers to use. When Seminole's customers take more electricity from the transmission system than expected, Florida Power must make up the difference with extra generation. By the same token, when Seminole's customers take less electricity than expected, Florida Power must find ways to deal with the excess generation. Either way, Florida Power incurs extra costs to provide this so-called "energy imbalance service," which are passed along to Seminole according to a formula set forth in Schedule 4 of the tariff that governs the rates Florida Power may charge.

Schedule 4, summarized in the following table and reproduced in relevant part below,[1] divides up charges for

---

[1] Under Schedule 4:

energy imbalance service into three tiers or "deviation bands:" a tier with a low rate that applies to deviations of up to 1.5% (with a minimum deviation of 2 megawatts); one with a medium rate that applies to deviations greater than 1.5% up to 7.5% (or greater than 2 megawatts up to 10 megawatts); and one with a high rate that applies to deviations above 7.5% (or above 10 megawatts).

---

Charges for energy imbalance shall be based on the deviation bands as follows: (i) deviations within +/- 1.5 percent (with a minimum of 2 [megawatts]) of the scheduled transaction to be applied hourly to any energy imbalance that occurs as a result of the Transmission Customer's scheduled transaction(s) will be netted on a monthly basis and settled financially, at the end of the month, at 100 percent of incremental or decremental cost; (ii) deviations greater than +/- 1.5 percent up to 7.5 percent (or greater than 2 [megawatts] up to 10 [megawatts]) of the scheduled transaction to be applied hourly to any energy imbalance that occurs as a result of the Transmission Customer's scheduled transaction(s) will be settled financially, at the end of each month, at 110 percent of incremental cost or 90 percent of decremental cost, and (iii) deviations greater than +/- 7.5 percent (or 10 [megawatts]) of the scheduled transaction to be applied hourly to any energy imbalance that occurs as a result of the Transmission Customer's scheduled transaction(s) will be settled financially, at the end of each month, at 125 percent of incremental cost or 75 percent of decremental cost.

J.A. 44.

| Deviation Band | Charge for Electricity |
|---|---|
| Between 0% and 1.5%, with a minimum of 2 megawatts | 100% of incremental cost |
| Greater than 1.5% up to 7.5%, or greater than 2 megawatts up to 10 megawatts | 110% of incremental cost |
| Above 7.5%, or above 10 megawatts | 125% of incremental cost |

Seminole filed a complaint with FERC alleging that Florida Power was violating Schedule 4 in two respects. First, Seminole claimed that Florida Power had been using the wrong measure for four and a half years to determine which tier's rate applies. Specifically, Florida Power would charge Seminole at a certain tier's rate if Seminole's usage crossed *either* the percentage or the megawatt threshold for that tier, rather than wait for the usage to cross *both* thresholds before imposing that rate. A simple example illustrates the problem: Suppose usage by Seminole's customers deviated by 2.5% from what was scheduled, but that—in absolute terms—the deviation amounted only to 1.9 megawatts. Florida Power would charge Seminole at the second tier's rate, rather than the first tier's rate, simply because the deviation (i.e, the imbalance) exceeded 1.5%. According to Seminole, that was impermissible because the tariff allowed charges at the second tier's rate only when usage had deviated by more than 1.5% (in relative terms) *and* more than 2 megawatts (in absolute terms). FERC ultimately agreed with Seminole that Florida Power's practice violated the tariff and that the co-op had been overcharged about $3.18 million—a finding that is not disputed by any party and is not at issue in this case. However, the remedy for that violation is.

FERC ordered Florida Power to refund the overcharges for a period going back 24 months from when Seminole first complained about them. FERC based its decision to restrict the refund period in this way on a provision of the companies' service agreement, reproduced below,[2] that establishes the process for challenging bills issued pursuant to the tariff. As FERC understood that provision, Seminole was barred from challenging any bill that it waited longer than 24 months to contest. Quite apart from its reading of how the time bar works, FERC argues that it would have exercised its discretion to restrict Seminole's refund anyway on the ground that the co-op should have discovered the overcharges earlier. Seminole challenges FERC's decision to limit the refund period.

Seminole's complaint to FERC alleged a second way that Florida Power was violating the tariff: Florida Power applied the rate of the highest applicable tier to the *entirety* of

---

[2] The provision, known as section 12.0, reads:

> The Customer may, in good faith, challenge the correctness of any bill rendered under the Tariff no later than twenty-four (24) months after the date the bill was rendered. . . . A bill rendered under the Tariff will be binding on the Customer twenty-four (24) months after the bill is rendered or adjusted, except to the extent of any specific challenge to the bill made by the Customer prior to such time. Customer's challenge of any bill rendered under and in accordance with this Tariff is limited to [] the arithmetical accuracy of the bill and the use of the correct rate and billing determinants for the service provided, [as well certain other types of errors not relevant here].

J.A. 94.

Seminole's imbalance, rather than apply each tier's rate to the portion of the imbalance that fell within each tier. To simplify what may seem at first blush a complicated matter, imagine that Seminole scheduled 100 megawatts of electricity to be delivered, but ended up using 111 megawatts, meaning that its customers used 11% more electricity than it had scheduled on their behalf. In that scenario, Florida Power would charge the highest tier's rate (125% of marginal cost) on *all* of Seminole's 11% deviation—a practice FERC refers to as *non-apportionment*.

Non-apportionment is not allowed under Seminole's reading of the tariff. According to Seminole, in this example Florida Power must charge the first tier's rate (100% of marginal cost) on the first 1.5 percentage points of Seminole's deviation; the second tier's rate (110% of marginal cost) on the portion of Seminole's deviation that is greater than 1.5% up to 7.5%; and the third tier's rate (125% of marginal cost) only on the very last portion of Seminole's deviation, above 7.5% up to 11%. In Seminole's view, charges for energy imbalance service work like the tax code: you pay the highest rate only on that portion of your income that falls into the highest tax bracket, not on all of your income. FERC refers to this approach as *apportionment*. As a result of Florida Power's use of non-apportionment rather than apportionment, Seminole paid Florida Power about $1.27 million more than it otherwise would have.

Seminole lost on this issue before FERC, initially and then again on reconsideration. In FERC's reading, the tariff requires neither apportionment nor non-apportionment, but leaves to the transmission provider the discretion which to use, given the different electricity needs around the country. FERC denied

Seminole's complaint on the question. Florida Power has intervened to defend FERC's orders.

II

We have jurisdiction to hear Seminole's challenges under section 313(b) of the Federal Power Act, which allows aggrieved parties to petition for review of FERC orders in our court. *See* 16 U.S.C. § 825*l*(b). We review those "orders under the Administrative Procedure Act's 'arbitrary and capricious' standard." *Entergy Servs., Inc. v. FERC*, 568 F.3d 978, 981 (D.C. Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)). "To satisfy this standard, [FERC] must 'demonstrate that it has made a reasoned decision based upon substantial evidence in the record, and the path of its reasoning must be clear.'" *Id.* (quoting *Sithe/Independence Power Partners v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999)).

We review claims that FERC acted arbitrarily and capriciously in interpreting contracts or tariffs "within its jurisdiction by employing the familiar principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*" *Id.* at 981-82. Thus, if the contract or tariff is unambiguous, we give effect to "the clear intent of the parties to the agreement." *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814 (D.C. Cir. 1998). If it is ambiguous, however, "we defer to the Commission's construction of the provision at issue so long as that construction is reasonable." *Id.* at 814-15.

8

III

A

We first address Seminole's claim that FERC improperly interpreted the service agreement to limit Florida Power's refund liability. Seminole contends that the 24-month time-bar provision applies only to claims that Florida Power made arithmetical or clerical errors in its bills, not to claims that Florida Power violated its tariff by charging Seminole a rate higher than it was allowed to charge. We disagree. FERC correctly concluded that the service agreement requires Seminole to make *any* challenge to a bill within 24 months of receiving that bill.

The plain text of Section 12.0 of the service agreement is the biggest obstacle to Seminole's preferred reading. On its face, the section limits all challenges to the 24-month period after a bill is issued: "bill[s] rendered under the Tariff will be binding on the Customer twenty-four (24) months after the bill is rendered or adjusted, except to the extent of any specific challenge to the bill made by the Customer prior to such time." J.A. 94. FERC understands section 12.0 to mean just what it says, *see* J.A. 303 ("We read this [sentence] to mean that a bill is binding unless it is challenged within a 24 month period after the bill was made available or adjusted."), and to work something like a statute of limitations on claims of overbilling like Seminole's. In other words, a customer that does not challenge a bill within two years is stuck.

Seminole claims that this seemingly unequivocal text does not bar it from challenging overcharges going further back than 24 months. First, Seminole draws our attention to the word "correctness" in the very first sentence of Section 12.0: "The

Customer may, in good faith, challenge the correctness of any bill rendered under the Tariff no later than twenty-four (24) months after the date the bill was rendered." J.A. 94. As Seminole sees it, a challenge to a bill's *correctness* takes on its arithmetical or clerical accuracy and is meaningfully different from a claim that a bill fails to charge the rate on file. Seminole relies on a prior decision by FERC that interpreted the word "accuracy" as it figured in another time-bar provision. In *California ex rel. Brown v. Powerex Corp.*, FERC found that a provision limiting a customer's "right to dispute the accuracy of any bill" to two years did not apply to alleged tariff violations, because disputes over tariff violations were not "dispute[s] regarding the clerical accuracy of bills." 135 FERC ¶ 61,178 at PP 92-93 (2011). Seminole argues that the same reasoning should apply here, because "[a]ccuracy and correctness are synonyms." Seminole Opening Br. 45.

Synonyms they may be in some contexts, but Seminole has given us no reason to think that they mean the same thing here. Nor has Seminole pointed us to any precedent interpreting "correctness" so narrowly, as to mean only arithmetical or clerical accuracy. Moreover, Seminole's assumption that synonyms in common parlance must be interchangeable in this context would prove the undoing of its argument. Elsewhere, FERC has been required to apply a contract provision that places time limits on claims challenging the "propriety" of bills to claims of tariff violations. *See Boston Edison Co. v. FERC*, 856 F.2d 361, 371 (1st Cir. 1988). "Correctness" is considered a synonym of "propriety." *See Propriety*, OXFORD ENGLISH DICTIONARY, http://en.oxforddictionaries.com/ definition/us/propriety (last visited June 23, 2017) (listing "correctness" as a synonym of "propriety," behind "decorum," "respectability," and "decency"); *see also Propriety*, MERRIAM-WEBSTER ONLINE, https://www.merriam-

webster.com/dictionary/propriety (defining propriety, in certain contexts, as "the state or quality of being correct and proper") (last visited June 23, 2017). According to the force of Seminole's own logic, then, FERC must always treat the word "correctness" as *including* tariff violations, not just clerical errors. Of course, that inference would be unsound, which proves our point: context matters. The fact that FERC once limited challenges to "accuracy" of bills to purported clerical and arithmetical errors tells us nothing about how the agency must interpret "correctness" in Section 12.0. Especially given the broad and unqualified scope of Section 12.0, *see* J.A. 94 ("*A bill* rendered under the Tariff *will be binding* on the Customer twenty-four (24) months after the bill is rendered . . . .") (emphasis added), FERC sensibly read "correctness" broadly in this context to "encompass[] not just computational errors in bills that correctly use the filed rate, but also bills that are based on a rate other than the filed rate." J.A. 229.

Seminole's next argument is even less persuasive. Seminole claims that Section 12.0 applies only to challenges to bills that are "'rendered under and in accordance with' the [Florida Power] tariff," and that a bill is not rendered "in accordance with" a tariff it violates. Seminole Opening Br. 48 (quoting J.A. 94). But Section 12.0 does not state that it applies only to bills rendered "in accordance with" the tariff. Rather, it starts by allowing Seminole to "challenge the correctness of *any* bill rendered under the Tariff"—that is, *any* bill issued for services the tariff covers. J.A. 94 (emphasis added). Next it states that "bill[s] rendered under the Tariff will be binding on the Customer" unless they are challenged within 24 months. J.A. 94. Only then does the agreement provide that a "[c]ustomer's challenge of any bill rendered under *and in accordance with* th[e] Tariff is limited to . . . the arithmetical accuracy of the bill and the use of the correct rate and billing

determinants for the service provided" and to a few other types of challenges not relevant here. J.A. 94 (emphasis added). In other words, Section 12.0 unequivocally provides that *any* bill issued under the tariff may be challenged and makes *all* bills issued under the tariff binding if not challenged within 24 months. It just so happens that Section 12.0 separately provides that a certain *subset* of bills—those rendered "in accordance with th[e] Tariff"—are subject only to certain types of challenges. J.A. 94. Thus, the phrase "in accordance with" in no way cabins what kinds of challenges Section 12.0 applies to in the first place.[3]

B

We turn to Seminole's claim that Schedule 4 of the tariff required Florida Power to calculate Seminole's charges using apportionment. Recall that Schedule 4 of the tariff divides up energy imbalance charges into three tiers. According to Seminole, charges for exceeding or undershooting its scheduled electricity usage *must* be apportioned among the tiers, yet Florida Power charged the highest applicable tier's rate on the *entire amount* of Seminole's excess usage. To support its position that Schedule 4 requires apportionment, Seminole points us to the U.S. tax code as an example of how such a system works. As Seminole sees it, just as you pay the highest tax bracket's rate only on the *portion* of your income falling into that bracket, Seminole should pay the highest tier's rate only on the *portion* of its deviation falling into that tier. If a taxpayer isn't expected to pay the highest applicable rate on all of her income, why should Seminole pay the highest

---

[3] Because we conclude that FERC properly interpreted the service agreement, we have no occasion to address FERC's alternative ground for imposing a 24-month refund-limitation period.

applicable rate on its entire deviation? The intuitive force of that argument, however, is undermined by the actual text of the tax code, which differs materially from the text of the tariff. An examination of the two shows that the plain text of Schedule 4 does not require apportionment.

| If taxable income is: | The tax is: |
| --- | --- |
| Not over $22,100 | 15% of taxable income. |
| Over $22,100 but not over $53,500 | $3,315, plus 28% of the excess over $22,100. |
| Over $53,500 but not over $115,000 | $12,107, plus 31% of the excess over $53,500. |
| Over $115,000 but not over $250,000 | $31,172, plus 36% of the excess over $115,000. |
| Over $250,000 | $79,772, plus 39.6% of the excess over $250,000. |

*See* 26 U.S.C. § 1(c).

As is evident from the table above, the tax code is *explicit* that each bracket's rate applies only to the portion of a taxpayer's income falling into that bracket. For instance, it specifies that if a person's taxable income falls into the second tier (between $22,100 and $53,500), she pays 15% on the first $22,100 of her income and 28% on all of her income above that amount.

Not so with Schedule 4 of the tariff. Schedule 4 simply states that "deviations within +/- 1.5 percent . . . will be . . . settled financially . . . at 100 percent of [marginal] cost," that "deviations greater than +/- 1.5 percent up to 7.5 percent . . .

will be settled financially. . . at 110 percent of [marginal] cost," and that "deviations greater than +/- 7.5 percent . . . will be settled financially . . . at 125 percent of [marginal] cost." J.A. 44. The text at least allows for (even if it does not compel) the approach that Florida Power took: if electricity usage has deviated more than X% from scheduled usage, apply to *the entire amount of the deviation* the rate that corresponds to a deviation of X%.[4]

Even so, Seminole argues, FERC should have determined that apportionment was required because the context in which the tariff was developed unmistakably supports that reading. All parties agree that interpretation of Schedule 4 of the tariff must be made in light of FERC Order No. 890. In that order, FERC set guidelines for how transmission providers should charge customers for energy imbalance service, *see generally* Preventing Undue Discrimination and Preference in Transmission Service, 72 Fed. Reg. 12,265 (Mar. 15, 2007) (Final Rule), by issuing a "pro forma" model tariff through notice and comment.

FERC explained that the purpose of its model language was to increase consistency among transmission providers in how they charged for energy imbalance service and to ensure that the level of charges "provide[d] appropriate incentives to keep schedules accurate without being excessive." *Id.* at

---

[4] The dictionary definition of "deviation" also allows the approach Florida Power took. Merriam-Webster defines a "deviation" as "an *act* or *instance* of deviating," which suggests that a deviation is a single event or unit. *Deviation*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/deviation (last visited June 23, 2017) (emphasis added). Thus, *instances* of deviating that exceed 7.5% could be billed at 125% of incremental cost, for the entire instance (i.e., the total amount of the deviation).

12,356. In looking for an example of a tariff that provided the right kind of incentives, FERC zeroed in on the approach taken by the Bonneville Power Administration, a federally owned transmission provider. Observing that Bonneville had "adopted an energy imbalance pricing approach based on a three-tiered deviation band that appears workable," FERC asked for comment on the merits of that approach. *Id.* at 12,345. As FERC found, many commenters "generally support[ed] a tiered approach to imbalance penalties that progressively increases the penalties for imbalances, as implemented by Bonneville." *Id.* Persuaded by these comments, FERC wrote that it was adopting "*pro forma . . .* imbalance provisions *similar to* those implemented by Bonneville." *Id.* at 12,349 (second emphasis added). Although transmission providers were free to submit tariffs of their own making that departed from the model tariff, Florida Power simply adopted FERC's language as its own.

Seminole points out that Bonneville, in practice, charges its transmission customers *using apportionment*. Because FERC stated that it was adopting pricing provisions "similar to those implemented by Bonneville" and did not affirmatively state that providers could use non-apportionment, Seminole contends that FERC must have meant for all providers to use apportionment. This argument overlooks a crucial difference between Bonneville's tariff and the FERC model: Bonneville's tariff states that the second tier's rate "applies *to the portion of* the deviation . . . greater than +/- 1.5% of the scheduled amount of energy . . . up to and including +/- 7.5%" and that the third tier's rate "applies *to the portion of* the deviation . . . greater than +/- 7.5% of the scheduled amount of energy . . . ." J.A. 140-41 (emphases added). So Bonneville's tariff, unlike FERC's model, explicitly requires apportionment. FERC's choice to leave out language that unambiguously requires apportionment implies strongly that the model tariff does *not*

so require. Indeed, this omission is strong evidence that FERC specifically crafted its model tariff to allow for non-apportionment. Seminole has no response to this point, except to fall back on its primary argument—which we have already rejected—that the tariff's plain text requires apportionment.

Seminole's other arguments about apportionment are misplaced. For example, Seminole maintains that FERC's goal of increased consistency compels apportionment, but we fail to see why. After all, FERC has achieved increased consistency simply by adopting a three-tiered energy-imbalance pricing structure that progressively increases the cost of imbalance service as the deviation from scheduled electricity usage increases.

Seminole also argues that apportionment must be required under the tariff because FERC has found that other tariffs that explicitly require apportionment are "consistent" with FERC's model tariff. For instance, as Seminole points out, FERC accepted the proposed tariff of the Louisville Gas and Electric Company (LG&E), which used the apportionment language from Bonneville, as "consistent with" the model tariff. Order on Proposed Variations from the Pro Forma Open Access Transmission Tariff, 120 FERC ¶ 61,227 at P 27 (2007). Seminole contends that if FERC found LG&E's tariff to be "consistent with" FERC's model, and LG&E's tariff explicitly calls for apportionment, then FERC should agree that the model tariff necessarily calls for apportionment too. But the LG&E example makes clear only that, in FERC's view, apportionment is acceptable under the model tariff, not that non-apportionment is unacceptable.

FERC may well have caused some confusion by remaining silent on the issue of apportionment yet expressly stating that it

was adopting a model tariff "similar to" Bonneville's. But the fact that the text of the tariff does not itself compel apportionment, combined with FERC's exclusion of apportionment language from its model tariff, at a minimum creates ambiguity about whether non-apportionment is allowed under the model tariff. In the face of that ambiguity, FERC has reasonably concluded that the tariff allows transmission providers to use non-apportionment. We must defer to that reasonable interpretation.

## IV

For the reasons stated above, we deny the petition for review.

*So ordered.*