# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 3, 2021       Decided January 21, 2022

No. 20-1495

DUKE ENERGY PROGRESS, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NORTH CAROLINA EASTERN MUNICIPAL POWER AGENCY,
INTERVENOR

———

Consolidated with 21-1008

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Misha Tseytlin* argued the cause for petitioner. On the briefs were *William R. Derasmo*, *Christopher R. Jones,* and *Miles H. Kiger*.

*Scott Ray Ediger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the

brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor. *Susanna Y. Chu,* Attorney, entered an appearance.

*Gary J. Newell* was on the brief for intervenor North Carolina Eastern Municipal Power Agency in support of respondent.

Before: HENDERSON, TATEL, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, *Circuit Judge*: Electricity producer Duke Energy Progress argues that its power purchase agreement with customer North Carolina Eastern Municipal Power Agency ("Power Agency") prohibits the latter from deploying battery storage technology designed to reduce metered demand during peak load periods. The Federal Energy Regulatory Commission disagreed, and Duke has given us no basis for second-guessing the Commission's interpretation of the power purchase agreement.

## I.

Duke generates electricity for Power Agency, a "joint agency" whose "members are 32 cities and towns in eastern North Carolina that own and operate municipal electric distribution systems." Intervenor Br. ii. Their power purchase agreement on file with the Commission requires Duke to supply Power Agency with its "full requirements of energy and capacity (i.e. the ability to meet future demand)." Resp't's Br. 5. In turn, the agreement obligates Power Agency to pay Duke an Energy Charge and a Capacity Charge. The Energy Charge "reimburses Duke only for its fuel costs and variable

operations and maintenance costs associated with producing the energy consumed by Power Agency." Pet'r's Br. 49; *see* Agreement § 5.3 ("Energy Charge"). The Capacity Charge, designed to cover Duke's fixed costs and provide a return on its infrastructure investments, is calculated by determining its pro rata share of the demand on Duke's system during a one hour "snapshot" of system usage taken during the peak hour on Duke's system each month. Pet'r's Br. 7–8; *see* Agreement § 5.1 ("Capacity Charge").

The power purchase agreement regulates activities Power Agency may employ to modify its electricity use, including Demand-Side Management and Demand Response. At oral argument, counsel for Duke described Demand-Side Management as end users accepting an inducement to "sign up for a program where Power Agency can turn . . . off and on" their appliances around high-demand periods. Oral Arg. Tr. 9. As an example, counsel referred to end users who "allow Power Agency to control [their] thermostat[s] or to precool [their] building[s]" in anticipation of a high-demand period. *Id.* at 25. By contrast, and again according to Duke's counsel, Demand Response involves a supplier providing end users information on the price of energy at a given time and those end users then modifying their consumption to avoid elevated prices during periods of elevated demand. As an example, counsel described a phone app that tells an end user, "it's going to cost you more money to run your washing machine now . . . . So you decide . . . not to run your washing machine now; you run it overnight because you've gotten some . . . pricing information . . . ." *Id.*

On December 23, 2019, Power Agency petitioned the Commission to issue an order declaring that the agreement's sections 9.4 and 9.5, which permit Demand-Side Management and Demand Response activities, respectively, authorize

Power Agency to modify its members' energy use and reduce its Capacity Charge by charging batteries during low-demand periods and then drawing from those batteries during the high-demand "snapshot" hour. Power Agency proposed to time the discharge of its batteries by analyzing the "Combined System load signal"—data that enables Power Agency to predict when the maximum demand on Duke's system will occur. *See* Agreement § 18.1 (requiring Duke to "furnish to Power Agency the Combined System load signal"). Concerned that Power Agency would reduce its Capacity Charge to zero, Duke opposed the petition, arguing that the proposed battery use qualified as neither Demand-Side Management nor Demand Response under the agreement.

The Commission granted Power Agency's petition, finding that the agreement "permits [Power Agency] to use battery storage technology as either Demand-Side Management or Demand Response." *North Carolina Eastern Municipal Power Agency*, 172 F.E.R.C. ¶ 61,249, at 62,738 (2020) ("Order Granting Petition"). The Commission denied rehearing, Duke petitioned for review, and Power Agency intervened.

## II.

"We review claims that FERC acted arbitrarily and capriciously in interpreting contracts . . . within its jurisdiction by employing the familiar principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* Thus, if the contract . . . is unambiguous, we give effect to the clear intent of the parties to the agreement. If it is ambiguous, however, we defer to the Commission's construction of the provision at issue so long as that construction is reasonable." *Seminole Electric Cooperative, Inc. v. FERC*, 861 F.3d 230, 234 (D.C. Cir. 2017) (internal quotation marks and citations omitted). Moreover, we

owe "great weight to the judgment of the expert agency that deals with agreements of this sort on a daily basis," because it "profits from familiarity with the field of enterprise to which the contract pertains." *Kansas Cities v. FERC*, 723 F.2d 82, 87 (D.C. Cir. 1983).

We begin—and end—with Demand Response, which is permitted by section 9.5 of the agreement. Entitled "Demand Response," that provision states:

> Nothing in this Agreement is intended to preclude Power Agency and/or its Members from instituting or promoting activities designed, in whole or in part, to manage or reduce the Members' demands and/or load through the use or communication of pricing information to Power Agency's or its Members' customers, such as the use of real-time pricing rates . . . .

Agreement § 9.5. The Commission concluded that Power Agency's proposal qualifies as Demand Response because it plans to use "real-time price information" to manage its members' loads by drawing electricity from batteries "during periods . . . when prices would be high due to high demand on [Duke's] system." Order Granting Petition, 172 F.E.R.C. ¶ 61,249, at 62,739 ("[Power Agency] explicitly proposes that the management or reduction of a [Power Agency] member's load through the use of battery storage technology would be facilitated both by the underlying pricing structure of the [agreement] and by the communication of real-time price information, as contemplated by [agreement] section 9.5."). In this context, the real-time price information is the so-called Combined System load signal that "[f]or many years[ Power Agency] has used" to "forecast when the peak-load periods that matter for pricing purposes are likely to occur." Petition for

Declaratory Order at 10 (Dec. 23, 2019) (first quote); Order Granting Petition, 172 F.E.R.C. ¶ 61,249, at 62,733 n.24 (second quote). The Commission defends this ruling as a "reasonable interpretation" of the relevant agreement provisions. Resp't's Br. 14. We agree.

Section 9.5 is a model of ambiguity. It does not define Demand Response, it never mentions batteries, and interpreting the provision required the Commission to infer the meaning of two of its terms, "demands" and "load," by reference to another provision of the agreement. Its key language—permitting Power Agency to "manage or reduce the Members' demands and/or load through the use or communication of pricing information to Power Agency's or its Members' customers"— is especially obscure. Obviously, "communication of pricing information" must be "to Power Agency's or its Members' customers." But what about the "use . . . of pricing information"? Must that also involve customers? That question is critical because although Power Agency proposes to use pricing information, it does not propose to involve customers. That, in Duke's view, is fatal because Demand Response "must occur *only* through the use of pricing information communicated, *not to Power Agency or its Members*, but to their respective end-use customers." Pet'r's Reply Br. 15. In effect, Duke deletes the words "use or" from section 9.5, as if it permits only "activities designed . . . to manage or reduce the Members' demands and/or load through the . . . communication of pricing information to Power Agency's or its Members' customers." For its part, the Commission understood section 9.5 to mean that Demand Response activities merely need to be "capable of managing or reducing demands and/or loads through the use or communication of pricing information." Order Granting Petition, 172 F.E.R.C. ¶ 61,249, at 62,739. In effect, the Commission adds the words "of pricing information" to section 9.5, as if it permits

"activities designed . . . to manage or reduce the Members' demands and/or load through the use [of pricing information] or communication of pricing information to Power Agency's or its Members' customers."

We thus have before us two competing interpretations of section 9.5. Given that we must "defer to the Commission's construction of the provision at issue so long as that construction is reasonable," it is not enough for Duke to offer its own reasonable interpretation of the provision. *Seminole Electric*, 861 F.3d at 234 (internal quotation marks omitted). Instead, Duke must demonstrate that the Commission's interpretation is unreasonable. It has failed to do so.

Duke next argues that Power Agency's proposal cannot qualify as Demand Response because, although it would reduce metered demand for Duke electricity during the snapshot, it would not actually reduce energy consumption. But that criticism finds no support in section 9.5, which says nothing of "consumption." Contrast that with another provision, section 9.3, which expressly dictates that the agreement is not intended to preclude activities designed to "reduce energy consumption." Agreement § 9.3. The drafters of the agreement thus knew how to refer to a reduction in energy consumption, but chose not to do so in section 9.5. Moreover, if Demand Response required an actual reduction in consumption, then Duke's own washing machine example would not qualify since it delays but does not altogether deter the washing machine's use.

Next, Duke argues that the Commission's interpretation "ignores the [agreement's] overall structure and purpose" by allowing Power Agency to draw electricity from batteries in violation of the agreement's "single clear premise—that Power Agency takes its full power supply needs from Duke—with a

few explicit and discrete exceptions." Pet'r's Br. 35–36. We disagree. As the Commission points out, under the proposal, "Duke will continue to supply (and [Power Agency] will continue to pay for) the energy needed to charge any batteries." Resp't's Br. 32.

Finally, Duke claims that the use of batteries would make the agreement "confiscatory because it would permit Power Agency to reduce its apparent demand to zero during the system peak, eliminating Power Agency's responsibility to pay for its *pro rata* share of Duke's fixed costs." Pet'r's Br. 47. As the Commission points out, however, section 16 of the agreement establishes a "process to propose changes to the rates, terms, and conditions of [the agreement], should Duke have 'concerns regarding whether the Contract remains appropriately compensatory.'" Resp't's Br. 36 (quoting *North Carolina Eastern Municipal Power Agency*, 173 F.E.R.C. ¶ 61,235, at 62,456 (2020)). Accordingly, should Power Agency deploy its batteries in a way that renders the agreement "confiscatory," Duke can return to the Commission for relief.

## III.

Having considered Duke's remaining arguments and found them either without merit or waived, we deny the petitions for review.

*So ordered.*