# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 11, 2023      Decided January 12, 2024

No. 22-1166

EAST TEXAS ELECTRIC COOPERATIVE, INC., ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AMERICAN ELECTRIC POWER SERVICE CORPORATION,
INTERVENOR

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

*A. Hewitt Rose, III* argued the cause for petitioners. With him on the briefs were *Brendan H. Connors*, *Jennifer Loiacano*, at the time the brief was filed, and *Craig Silverstein. Michael Sappington* entered an appearance.

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*William M. Keyser* argued the cause for intervenor for respondent American Electric Power Service Corporation. With him on the brief was *Shaun Boedicker*. *Matthew L. Bly*, *Stacey L. Burbure*, and *Steven J. Ross* entered appearances.

Before: KATSAS, CHILDS and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

PAN, *Circuit Judge*. American Electric Power Service Corporation ("AEP") is a public utility that produces and transmits electricity. AEP calculates the rates that it charges its customers for transmission services based on a formula published in a tariff that is approved by the Federal Energy Regulatory Commission ("FERC" or "the Commission"). A group of AEP's customers challenged AEP's calculation of its 2019 transmission rates. FERC rejected several of the asserted claims of error, and the customers petitioned for review of the agency's decision. Because FERC properly interpreted the terms of AEP's tariff and did not act arbitrarily and capriciously, we deny the petition for review.

**I.**

**A.**

Under the Federal Power Act ("the Act"), 16 U.S.C. § 791a *et seq.*, FERC regulates a web of entities that transmit and distribute electricity at wholesale in interstate commerce. 16 U.S.C. § 824(b)(1). After power generators produce electricity — largely from coal, natural gas, nuclear fuel, and renewables — public utilities transmit and sell the electricity to local utilities. Public utilities own the transmission facilities through which the electricity travels. The local utilities that purchase this electricity are also known as "load-serving

entities." *Advanced Energy United, Inc. v. FERC*, 82 F.4th 1095, 1103 (D.C. Cir. 2023). They distribute the electricity to consumers. *See* ENERGY PRIMER: A HANDBOOK FOR ENERGY MARKET BASICS 35–39 (2020); *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 4–5 (D.C. Cir. 2015).

The Act gives FERC jurisdiction to regulate the wholesale rates charged by public utilities for their electricity-transmission services, as well as the terms and conditions of such service. *See* 16 U.S.C. § 824d(a) (conferring jurisdiction over "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy," as well as "all rules and regulations affecting or pertaining to such rates"); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 264–66 (2016). Electricity rates can be market-based or cost-based. Most transmission services are priced using cost-based rates, which are calculated based on a formula published in each utility's tariff that must be approved by FERC. 16 U.S.C. § 824d(c), (d); *Newman v. FERC*, 27 F.4th 690, 693 (D.C. Cir. 2022). Cost-based rates allow utilities to recover the costs they incur to provide service — including costs for building, operating, and maintaining transmission facilities — and guarantee a fair return on capital. Such rates largely rely on the utility's "cost components" to determine what will be charged. *Newman*, 27 F.4th at 693 (citation omitted).

A utility's tariff must include "schedules showing all rates and charges for any transmission or sale . . . and the classifications, practices, and regulations affecting such rates and charges." *See* 16 U.S.C. § 824d(c). Once filed, "no change shall be made . . . in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public" in another filing with FERC. *Id*. § 824d(d). Pursuant

to Section 205 of the Act, when a utility files a new or amended tariff, FERC publishes the proposed tariff in the Federal Register and sets a deadline for third parties — such as the utility's customers — to intervene in the proceedings and to file protests that challenge the "classifications, practices, and regulations" included in the tariff. *Id*. § 824d(c), (d); 18 C.F.R. § 385.210; *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021). FERC will reject a proposed tariff that is not "just and reasonable." 16 U.S.C. § 824d(a); *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1226 (D.C. Cir. 2018). In considering whether to reject or approve a proposed tariff, FERC may order a hearing or require settlement procedures to resolve issues arising out of interventions and protests. 18 C.F.R. § 385.502; *id.* § 385.603.

Once FERC approves a tariff's cost-based formula, which is also known as a "formula rate," the public utility calculates the amount that it will charge for transmission services by inputting the utility's annual costs into the formula. *Newman*, 27 F.4th at 693. To generate the charged rate each year, the utility need only file an annual report of its pertinent costs. *Id*. The cost-based formula thus allows the utility to pass on fluctuating costs to its customers. But it also protects customers by preventing utilities from "using excessive discretion in determining the ultimate amounts charged." *Kan. Corp. Comm'n v. FERC*, 881 F.3d 924, 927 (D.C. Cir. 2018) (citation and internal quotation marks omitted).

FERC's Uniform System of Accounts provides standardized definitions for the cost inputs that are used to determine transmission rates. The Uniform System of Accounts correlates the utility's costs to "ready-made 'accounts,' including descriptions of what belongs in them, for categorization purposes." *Newman*, 27 F.4th at 693; *see also* 18 C.F.R. pt. 101. For example, the Uniform System instructs

utilities to categorize "rents receivable or accrued on property rented or leased by the utility to others" in an account labeled Account 172 for "Rents receivable." 18 C.F.R. pt. 101, Account 172. A utility's cost-based formula rate might include Account 172 as a cost to be recovered in the charged rate. Thus, "[a] formula rate built on the Uniform System identifies by account which expenditures are passed on to ratepayers, and which fall outside the formula rate so must be absorbed by the utility itself." *Newman*, 27 F.4th at 693.

A public utility's tariff also typically includes "protocols," which are rules that specify the procedures for notice, review, and objection to the rates that customers will be charged. *See Ala. Power Co.*, 178 FERC ¶ 61,207, at PP 2–3 (2022). Protocols describe the ways in which customers can challenge the utility's cost inputs, which determine the rate charged each year. Protocols are considered a "safeguard" to ensure that the rates are properly calculated, *id.*, because costs that are misclassified or erroneously included as inputs in a formula rate may result in higher charges to customers.

Challenges to formula inputs in a given rate year under a tariff's protocols are reviewable by FERC under Section 205 of the Act. 16 U.S.C. § 824d(a). In such review proceedings, the utility bears the burden of proving that its cost inputs are "just and reasonable" based on the utility's proper application of the terms of the formula rate. *Id.* § 824d(e). By contrast, if a customer wishes to challenge the *formula itself*, including how costs are classified or which costs are included in the formula, it must bring a complaint before FERC under Section 206 of the Act. Section 206 empowers the Commission to examine an existing formula upon complaint or on its own initiative. *See id.* § 824e(a). Pursuant to Section 206, "after a hearing held upon its own motion or upon complaint," the Commission may set aside any cost-based

formula found to be "unjust, unreasonable, unduly discriminatory or preferential," and replace it with a just and reasonable formula. *Id*.; *see also NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 171 (2010).

**B.**

The tariff at issue in this case is the product of a settlement that FERC approved in 2019. *Sw. Power Pool, Inc*., 167 FERC ¶ 61,272 (2019); *Sw. Power Pool, Inc.*, 161 FERC ¶ 61,306 (2017). All four petitioners in this case are transmission customers of AEP's affiliates that were involved in the tariff-settlement negotiations with AEP; and three of them agreed to the tariff. *See Sw. Power Pool, Inc*., 167 FERC ¶ 61,272, at P 1.[1]

AEP's tariff includes a "formula rate template" and tariff protocols.[2] The template is a detailed spreadsheet in which

---

[1] Three of the petitioners — East Texas Electric Cooperative, Inc., Northeast Texas Electric Cooperative, Inc., and Golden Spread Electric Cooperative, Inc. — were settling parties. *Sw. Power Pool, Inc*., 167 FERC ¶ 61,272, at P 1. The fourth petitioner — Arkansas Electric Cooperative Co. — intervened in the proceeding, but "neither join[ed] as a Settling Party nor oppose[d] the Settlement Agreement." *Id.* at P 1 n.2.

[2] What we call "AEP's tariff" is actually two tariffs administered by the Southwest Power Pool Regional Transmission Organization ("RTO"). *See* Southwest Power Pool Tariff, Sixth Revised Vol. No. 1, attach. H, add. 4 (J.A. 143–233), add. 12 (J.A. 234–316). RTOs are non-profit entities that oversee and operate the transmission of electricity between member utilities and their customers. *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 110 (D.C. Cir. 2017) (citing 16 U.S.C. § 824d(c)). RTOs have the power to file tariffs on behalf of their member utilities, as Southwest Power

AEP inputs its various costs to calculate its yearly rate, pursuant to its cost-based "Formula Rate." The tariff protocols ("the Protocols") establish procedures for reporting and challenging the cost inputs. *See* Protocols (J.A. 212–32). They provide that AEP must file an "Annual Projection" of costs no later than October 31 of the year preceding the rate year, which allows AEP to estimate a rate based on its *projected* costs for the rate year. *Id*. § 1(a). That projected rate is initially charged to AEP's customers. On or before May 25 of the year following the rate year, AEP is required to file an "Annual Update," which includes an accounting of its *actual* costs during the rate year. AEP calculates a "True Up" rate based on the actual costs in the Annual Update. *Id*. § 3(a), (e). After the True Up rate is determined, customers pay charges or receive refunds that reflect the difference between AEP's projected rate and the True Up rate. *Id*. §§ 2–3. Under the Protocols, each Annual Update must include "sufficient detail and sufficient explanation to enable Interested Parties to replicate the calculation of the Annual Update results from the FERC Form No. 1 and verify that each input to the Template is consistent with the requirements of the Formula Rate." *Id.* § 3(e)(ii).[3] The Protocols also specify that AEP's accounting "shall be maintained consistent with the FERC Uniform System of Accounts." *Id.* § 2(a).

Interested parties who wish to dispute the Formula Rate inputs for a given rate year must first submit a "Preliminary Challenge," which initiates an informal resolution and discovery process with AEP. Protocols § 4(a). If the issues in

Pool RTO did here on behalf of AEP's affiliates. 18 C.F.R. § 35.34(j)(1)(iii).

[3] FERC Form No. 1 is an annual report of financial and operational disclosures that major electric utilities are required to file with FERC each year. *See* 18 C.F.R. § 141.1.

controversy cannot be resolved through the preliminary-challenge process, the interested parties may file a "Formal Challenge" with FERC. *Id.* § 5(a). Preliminary and Formal Challenges may raise only a limited number of issues related to the calculation of the rate charged to customers.[4]

The Protocols provide that an Annual Update "shall not be subject to challenge by any Interested Party seeking to modify the Formula Rate [(*i.e.*, the cost-based formula reflected in the tariff)]." Protocols § 3(e)(vi). Instead, "any modifications to the Formula Rate will require, as applicable, [a Federal Power Act] section 205 or section 206 filing or initiation of a section 206 investigation." *Id.* In other words, modification of the cost-based formula itself requires the proposal of a new formula under Section 205, or an investigation of the existing formula under Section 206.

---

[4] Those issues are:

> (i) the extent or effect of an Accounting Change; (ii) whether the Annual Update or Annual Projection fails to include data properly recorded in accordance with these Protocols; (iii) the proper application of the Formula Rate and procedures in these Protocols; (iv) the accuracy of data and consistency with the Formula Rate of the calculations shown in the Annual Update and Annual Projection; (v) the prudence of actual costs and expenditures; (vi) the effect of any change to the underlying Uniform System of Accounts or FERC Form No. 1; or (vii) any other information that may reasonably have substantive effect on the calculation of the charge pursuant to the formula.

Protocols § 5(c).

9

## C.

In May 2020, AEP filed its 2020 Annual Update, which included the True Up calculations for the rate to be charged for transmission services provided in 2019.  Petitioners filed a Preliminary Challenge to the 2020 Annual Update, and later, a Formal Challenge before FERC.  The Formal Challenge raised several issues that could not be resolved through the preliminary-challenge process.

On March 24, 2022, FERC issued an order granting in part and denying in part petitioners' Formal Challenge.  *See Sw. Power Pool, Inc.* (*AEP Order*), 178 FERC ¶ 61,208 (2022).  FERC's order rejected petitioners' request for retroactive relief for alleged errors in previous rate years.  It further rejected petitioners' challenge to AEP's inclusion of certain inputs in the 2019 charged rate, including coal-related costs, tax credits purchased by an AEP affiliate, and employee pension and benefit costs.[5]  Petitioners timely filed a petition for review of FERC's order and FERC's notice denying rehearing.  We have jurisdiction under the Federal Power Act, 16 U.S.C. § 825*l*(b).

## II.

We will uphold FERC's orders unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A reviewing court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and

---

[5]  FERC ruled in petitioners' favor on several issues as well.  It found that AEP erred in calculating (1) fees paid to state public service commissions; (2) capital lease interest expenses; and (3) accumulated deferred income taxes related to accruals and rate refunds.  Those issues are not before us.

the choice made.'" *Ass'n of Oil Pipe Lines v. FERC*, 876 F.3d 336, 342 (D.C. Cir. 2017) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In FERC cases, we "afford great deference to the Commission in its rate decisions."  *Elec. Power Supply Ass'n*, 577 U.S. at 292.  Because ratemaking involves "complex industry analyses and difficult policy choices[,] the court will be particularly deferential to the Commission's expertise."  *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1431 (D.C. Cir. 1996).  We ask only whether FERC's orders are reasonable and adequately explained.  *Long Island Power Auth. v. FERC*, 27 F.4th 705, 712 (D.C. Cir. 2022).

"When reviewing the Commission's interpretation of a tariff, this court first considers *de novo* whether the relevant language unambiguously addresses the matter at issue, and if so, we apply that unambiguous meaning."  *Okla. Gas*, 11 F.4th at 827 (cleaned up).  "If, however, there is ambiguity, we defer to the Commission's construction so long as that construction is reasonable."  *Id*. (cleaned up).  We generally give "substantial deference to FERC's interpretation of filed tariffs, even where the issue simply involves the proper construction of language." *S. Cal. Edison Co. v. FERC*, 415 F.3d 17, 21 (D.C. Cir. 2005) (cleaned up).  We also defer to FERC's reasonable interpretation of the Uniform System of Accounts. *See N. Border Pipeline Co. v. FERC*, 129 F.3d 1315, 1318 (D.C. Cir. 1997).

## III.

Petitioners appeal four rulings in FERC's order resolving their Formal Challenge.  Their first argument concerns FERC's interpretation of the Protocols to preclude relief for errors that allegedly occurred in prior rate years.  The remaining three

arguments take issue with the inclusion of certain cost inputs in the 2019 charged rate. We conclude that FERC did not act arbitrarily and capriciously, and correctly interpreted the terms of AEP's tariff.

**A.**

Petitioners' Formal Challenge alleged errors that extended to prior rate years, not just 2019. *See, e.g.*, J.A. 34 (requesting that AEP "issue refunds, including interest, dating back to the original error"). Petitioners contended that retroactive correction of such errors is permissible under the Protocols and is consistent with long-standing FERC policy and precedents. FERC concluded, however, that refunds for errors made in previous rate years are barred under the governing Protocols. We agree with FERC that the Protocols preclude retroactive error correction, and that the Protocols are controlling.

"A tariff provision," such as a term found in AEP's Protocols, "must be understood according to its plain meaning, which we draw from its text and context." *Okla. Gas*, 11 F.4th at 827. Here, the relevant text is set forth in Section 5(d) of the Protocols, which provides:

> Failure to pursue an issue through a Preliminary Challenge or to lodge a Formal Challenge regarding any issue as to a given Annual Update shall bar pursuit of such issue with respect to that Annual Update, but shall not bar pursuit of such issue or the lodging of a Formal Challenge as to such issue as it relates to a subsequent Annual Update.

Protocols § 5(d). The Protocols generally impose deadlines of up to 210 or 270 days to submit Preliminary and Formal Challenges.[6]

Section 5(d) plainly prohibits parties from challenging formula inputs after the period to submit a Preliminary or Formal Challenge has elapsed for a given rate year. Specifically, the provision makes clear that a customer's failure to challenge an issue "as to a given Annual Update" bars relief "with respect to that Annual Update." Protocols § 5(d). Consider an example. If a customer wished to seek relief for an alleged error in the rate that was charged in 2020, that customer was required to file a challenge to the 2021 Annual Update, which included the True Up calculations for the 2020 rate year. That would have been the time to lodge a challenge "with respect to that Annual Update." If the issue was not raised by filing a challenge in the requisite timeframe, such failure would "bar pursuit of such issue with respect to that [2021] Annual Update," which relates to the 2020 rate year. The 2021 Annual Update and the rates charged for the 2020 rate year could not be corrected now, in 2024. Thus, Section 5(d) unambiguously bars a customer from seeking relief through an untimely challenge for an issue that arose in a prior Annual Update. But the Protocols specifically provide that if the same issue arises in a later year, say 2023, the

---

[6]   A Preliminary Challenge is due up to 210 calendar days following the publication of an Annual Update or Annual Projection, or 30 calendar days after "receipt of all responses to timely submitted information requests (unless such period is extended with the written consent of AEP or by FERC order)." Protocols § 4(a). Similarly, a Formal Challenge may be filed up to 270 calendar days following such publication, "unless such period is extended with the written consent of AEP or by FERC order." *Id.* § 5(a).

customer could seek timely relief "as it relates to [that] subsequent Annual Update."

Petitioners disagree and argue that the Protocols' language allows retroactive challenges to rates charged in prior rate years. They contend that "[t]he text says nothing at all about waiving pursuit of an issue in a *prior* Annual Update," and that Section 5(d) does not apply to "issue[s] *discovered after* that Annual Update." Pet'rs' Opening Br. 19 (first emphasis in original) (internal quotations omitted). But those arguments are incompatible with the Protocols' text and context.

The cost-based formula in a tariff is publicly available and remains unchanged year after year (unless and until a new rate is approved under Section 205). *See* 16 U.S.C. § 824d. Thus, although Section 5(d) does not explicitly mention "prior" years, the same Protocols presumably were in effect in each previous rate year, and petitioners were obligated to timely file their challenges each year. Petitioners err in arguing that Section 5(d) does not bar challenges to newly discovered errors in previously charged rates. Challenges to past rates are not properly characterized as newly discovered because petitioners had the opportunity to "discover" any such problems in the years in which they occurred. Furthermore, petitioners' proposed interpretation of Section 5(d) undermines the purpose of the review process implemented by the Protocols, which is intended to ensure that the formula rate is properly calculated each year and to promptly correct any deficiencies. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 139 FERC ¶ 61,127, at PP 9–10 (2012); *see also* Pet'rs' Opening Br. 12 (the Protocols are "[s]afeguards . . . to ensure that the input data is correct, [and] that the calculations are performed consistent with the formula" (quoting *Ala. Power Co.*, 178 FERC ¶ 61,207, at PP 2–3) (cleaned up)).

Petitioners further argue that FERC departed from a long-standing practice of allowing retroactive error correction. But we have previously held that the unambiguous language in a utility's "filed rate," *i.e.*, the rate approved by FERC, is controlling — irrespective of any contrary, general practice — and that such language may limit the period for lodging objections to charged rates. *See Seminole Elec. Coop., Inc. v. FERC*, 861 F.3d 230, 234 (D.C. Cir. 2017). FERC has also applied this rule. *See AEP Order*, 178 FERC ¶ 61,208, at P 14; *Kan. Elec. Power Coop., Inc. v. Evergy Kan. Cent., Inc.*, 175 FERC ¶ 61,044, at P 101 (2021) ("[T]he Commission has found, and the D.C. Circuit has upheld" that "when a formula rate agreement explicitly limits the challenge period, . . . specific provisions can prohibit challenge."). Here, petitioners must adhere to AEP's Protocols in purchasing transmission services from AEP because the Protocols are part of the filed rate approved by FERC under Section 205 of the Act.

In *Seminole*, we upheld FERC's enforcement of a service agreement that imposed a 24-month deadline for customers to file objections to rates charged for transmission services. *See* 861 F.3d at 231, 233 & n.2 (setting deadline "no later than twenty-four (24) months after the date the [customer's] bill was rendered"). We held that "[t]he plain text" of the provision clearly barred challenges to charges that a customer "waited longer than 24 months to contest," and therefore functioned "like a statute of limitations." *Id.* at 233–34. The same logic applies here. Like the service agreement at issue in *Seminole*, the Protocols are part of AEP's filed rate, which is binding on the parties, and establishes "the process for challenging bills issued pursuant to the tariff." *Id.* at 233; *Okla. Gas*, 11 F.4th at 830 ("[T]he 24-month limitation on retroactive billing" in *Seminole* was "itself the filed rate." (cleaned up)); Protocols at 1 (AEP's formula rate template and Protocols "together comprise the filed rate."). There is no question that parties are

bound by the utility's filed rate, whether its terms are set forth in tariff protocols or in a service agreement. *Okla. Gas*, 11 F.4th at 830–31.[7] And obligations under the Federal Power Act "appl[y] whether the rates and charges are set 'unilaterally by tariff' or agreed upon in individual contracts between sellers and buyers." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 12 (D.C. Cir. 2014) (quoting *NRG*, 558 U.S. at 171). Thus, under the Protocols, an AEP customer's failure to pursue a Section 205 challenge within the time allotted "as to a given Annual Update" precludes future relief "with respect to that Annual Update." Protocols § 5(d).[8] If a customer misses the deadline, they are "stuck." *Seminole*, 861 F.3d at 234.

In sum, the Protocols govern the viability of petitioners' claims in a Formal Challenge, and FERC correctly interpreted Section 5(d) of the Protocols to preclude retroactive relief for protocol-based challenges brought pursuant to Section 205.

[7] The "filed rate doctrine" encompasses the statutory provisions that "mandat[e] the open and transparent filing of rates [with FERC] and broadly proscrib[e] their retroactive adjustment." *Okla. Gas*, 11 F.4th at 829. The doctrine therefore refers to "the interconnected statutory requirements that bind regulated entities to charge only the rates filed with FERC and to change their rates only prospectively." *Id.*; *see also Towns of Concord v. FERC*, 955 F.2d 67, 70–72 (D.C. Cir. 1992) (detailing the origins of the filed-rate doctrine and its justifications). A utility's filed rate "is not limited to 'rates' *per se*," but also includes terms "directly affect[ing] [a utility's] wholesale rates." *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966–67 (1986).

[8] The protocol-based challenge at issue in this appeal is a challenge brought under Section 205, and the Protocols expressly preserve the right of any party to separately file challenges under Section 206. *See* Protocols § 5(b), (g). Thus, Section 5(d) does not affect time limitations for a party's ability to bring a separate Section 206 challenge.

Accordingly, FERC properly denied petitioners' request for refunds from prior rate years.

**B.**

Petitioners' remaining arguments dispute the inclusion of specific cost inputs in the 2019 charged rate. We are "particularly deferential to the Commission's expertise" in making highly technical rate classifications. *Ass'n of Oil Pipe Lines*, 83 F.3d at 1431. Because FERC's order is reasonable and adequately explained, we reject each of petitioners' contentions.

**1.**

Petitioners first take issue with AEP's use of an "allocation factor" to include certain costs — associated with coal mining and a coal railcar facility — in calculating the 2019 charged rate.[9] An allocation factor assigns a certain percentage of a cost incurred by a public utility to each of the utility's various functions (*i.e.*, production, transmission, and distribution of electricity). Here, consistent with the Formula Rate published in its tariff, AEP applied an allocation factor to assign a certain percentage of "General Plant" costs, including coal-related costs, as "transmission costs" included in the 2019 charged rate. Under the Uniform System of Accounts, the coal-related costs were assigned to Account 399, which includes "the cost of tangible utility plant not provided for elsewhere." 18 C.F.R. pt. 101, Account 399. Petitioners argue that the coal-related costs did not, in fact, relate to transmission services because they are "100% generation-related" and therefore should be

---

[9] To fuel its power plants, AEP uses a type of coal (called "lignite") from nearby coal mines. AEP also maintains a coal railcar facility that maintains AEP-owned and third-party-owned railcars, which are used to deliver coal throughout the United States.

categorized as "generation rates." Pet'rs' Opening Br. 25. But in their Formal Challenge before FERC, petitioners acknowledged that the costs in question "are allowed to be reported in Account 399." J.A. 15. Moreover, petitioners do not appear to dispute that AEP's Formula Rate called for including a portion of the costs in Account 399 in the rate charged for transmission services in 2019.

FERC correctly concluded that petitioners' claim is an improper challenge to the formula itself, which may not be brought as a Formal Challenge under the Protocols. *AEP Order*, 178 FERC ¶ 61,208, at P 33 (stating that "the Formal Challenge may address the proper application of the Formula Rate, but may not address issues that would involve a change to the Formula Rate itself"). The inclusion of the disputed coal-related costs in determining the charged rate was dictated by the Formula Rate, which applied an allocation factor to apportion transmission costs from the General Plant account. Petitioners' opposition to the use of an allocation factor is an objection to the cost-based formula, which must be raised in a separate action under Section 206. *See* 16 U.S.C. § 824e(a).[10]

---

[10]  Petitioners belatedly contend that this challenge is in fact cognizable under the tariff-based challenge process — namely, under Section 5(c)(ii) or (vii) of the Protocols. Section 5(c)(ii) allows a challenge where "the Annual Update or Annual Projection fails to include data properly recorded in accordance with these Protocols," and Section 5(c)(vii) permits a challenge regarding "any other information that may reasonably have substantive effect on the calculation of the charge pursuant to the formula." This argument is forfeited because it was not raised before FERC in the petition for rehearing. By statute, we may not consider any objection "unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 16 U.S.C. § 825*l*(b); *see also Off. of Consumers' Couns. v. FERC*, 914 F.2d 290, 295 (D.C. Cir. 1990) ("Petitioners cannot

Thus, FERC did not act arbitrarily or capriciously in rejecting petitioners' claim that the coal-related costs were improperly included in the 2019 charged rate.

**2.**

Petitioners disagree with AEP's classification of certain tax credits as prepayments for tax liabilities. Prepayments are costs that are included in the Formula Rate. AEP recorded the tax credits in question under Account 165 (Prepayments), which is defined in the Uniform System of Accounts as "amounts representing prepayments of insurance, rents, taxes, interest[,] and miscellaneous items." 18 C.F.R. pt. 101, Account 165. Petitioners argue that because AEP sold the credits before applying them to any tax liabilities, they were not "prepayments." We conclude that FERC reasonably interpreted the tariff and the Uniform System of Accounts to permit AEP to include the tax credits as prepayments in the 2019 charged rate, and we defer to the agency's interpretation. *S. Cal. Edison Co.*, 415 F.3d at 21.

FERC determined that AEP's classification was proper because the credits were still owned by AEP at the close of 2019, and therefore "were available to be used to pay or offset future Oklahoma income tax liabilities." *AEP Order*, 178 FERC ¶ 61,208, at P 44. That is consistent with the process prescribed by the Uniform System of Accounts, which provides that "[e]ach utility shall close its books at the end of each *calendar year* unless otherwise authorized by the Commission." 18 C.F.R. pt. 101, Gen. Instruction No. 4 (emphasis added). Petitioners err in arguing that the tax credits should have been recorded in Account 236 (Taxes Accrued) and then reclassified once they were sold. The instructions for

---

preserve an objection indirectly [in a petition for rehearing]."). Petitioners offer no reasonable explanation for their oversight.

Account 236 explicitly state that "[a]ny amount representing a prepayment of taxes applicable to the period subsequent to the date of the balance sheet, shall be shown under *account 165*." 18 C.F.R. pt. 101, Account 236 (emphasis added).[11] FERC therefore reasonably applied the Uniform System of Accounts and concluded that the disputed costs were properly classified and included in the 2019 charged rate.

**3.**

Lastly, petitioners challenge AEP's inclusion of employee pension and benefit costs in the 2019 charged rate. The tariff's formula template requires AEP "to remove the unfunded reserves associated with *contingent liabilities* . . . from [the] rate base." J.A. 158 at Note U (emphasis added). Petitioners argue that the disputed costs were "contingent liabilities" that should have been removed. We defer to FERC's sound determination that the costs in question were not contingent liabilities.

The Uniform System of Accounts defines "contingent liabilities" as "items which may under certain conditions

---

[11] Petitioners further object by citing both FERC precedent regarding the classification of tax *refunds* (not credits) and FERC audits in which FERC concluded that tax overpayments should not be classified as prepayments. Those precedents are inapposite. In *Midwest Indep. Transmission Sys. Operator, Inc.* (*MISO*), FERC held that a tax refund received in 2009 could not be treated as a prepayment because it did not relate to "taxes applicable to periods subsequent to 2009." *MISO*, Opinion No. 534, 148 FERC ¶ 61,206, at P 173 (2014). Similarly, the cited audits considered only how money was used by the utilities *in the years at issue. See, e.g.*, *Audit of PPL Corporation's Affiliate Transactions*, FERC Dkt. No. FA12-12-000, 24–25 (Oct. 9, 2014). Consistent with those holdings, FERC determined here that the tax credits in question should be classified based on their status at the end of the relevant calendar year.

become obligations of the utility but which are neither direct nor assumed liabilities at the date of the balance sheet." 18 C.F.R. pt. 101, Gen. Instruction No. 15. Petitioners argue that pension and benefit costs are contingent liabilities because they are uncertain, "both in the amount of the liability and whether they will be paid at all." Pet'rs' Opening Br. 39. But FERC reasonably concluded that such costs are not contingent because at the time they were classified and included in the charged rate, "the utility [knew] that it [would] incur those expenses even if the timing of such expenses [was] uncertain." *AEP Order*, 178 FERC ¶ 61,208, at P 51. FERC therefore found that AEP's classification of employee pension and benefit costs was "consistent with the Formula Rate template and the [Uniform System of Accounts]." *Id*. We give "substantial deference to FERC's interpretation of [AEP's] filed tariffs." *See S. Cal. Edison Co.*, 415 F.3d at 21 (cleaned up); *N. Border Pipeline*, 129 F.3d at 1318 (explaining that courts should defer to FERC's interpretation of its own Uniform System of Accounts instructions).[12]

---

[12] FERC's interpretation is supported by other authorities that bear on whether pension liabilities should be classified as "contingent." For example, the Government Accountability Office states that there is a "fundamental difference" between pension liabilities, which "are known to exist, [even though] their exact size in future years cannot be determined with complete certainty," and contingent liabilities, which are "conditional commitments which may become actual liabilities if an event over which the government does not have complete control takes place." Letter from the Comptroller of the United States to Richard Kelly, United States House of Representatives (Feb. 23, 1978) at 1, https://perma.cc/BA2K-UCW7. And the International Accounting Standards ("IAS") explain that "[c]ontingent liabilities do not include provisions for which it is certain that the entity has a present obligation . . . even though the amount or timing is uncertain." Int'l Fin. Reporting

21

\*    \*    \*

For the foregoing reasons, we deny the petition for review.

*So ordered.*

---

Standards Found., *IAS 37: Provisions, Contingent Liabilities and Contingent Assets*, https://perma.cc/E6JD-M2AX.